

# Missouri Court of Appeals

## Southern District

### Division Two

MORRIS BRANSON THEATRE, LLC,   )
      )
    Plaintiff-Appellant,     )
      )
v.       )     No. SD33581
      )
CINDY LEE, LLC and DAVID L.   )     **Filed: Oct. 15, 2015**
GOODE,       )
      )
    Defendants-Respondents.     )

### APPEAL FROM THE CIRCUIT COURT OF TANEY COUNTY

Honorable Larry Luna, Associate Circuit Judge

### <u>REVERSED AND REMANDED</u>

This appeal requires us to construe the provisions of a lease agreement ("the Lease") between Plaintiff Morris Branson Theatre, LLC ("Landlord") and Defendants Cindy Lee, LLC ("Tenant") and Tenant's president, David L. Goode.[1]

The Lease, executed on September 30, 2011, stated that Tenant would lease certain retail space from Landlord (designated therein as the "Premises") for a stated term of three years. After execution of the Lease, Tenant utilized the Premises, located adjacent to the Dick Clark Theater in Branson, to operate the Midtown Café and Club '57. Less than a year into the Lease's term, Tenant submitted a letter that purported to terminate the Lease based

---

[1] Defendant Goode personally guaranteed Tenant's obligations under the Lease.

upon Landlord's failure to make certain repairs following damage inflicted by a tornado that struck the area. Landlord subsequently filed suit against Tenant for breach of contract.

After a bench trial, the trial court issued a judgment in favor of Defendants based primarily upon three separate paragraphs of the Lease. The trial court first construed the definition of "Premises[,]" contained within Paragraph 1 of the Lease, as including the exterior walls of the building that housed the Midtown Café and Club '57. Based at least in part on that interpretation, the trial court found that Landlord had failed to repair and restore the Premises, within six months, to substantially the same condition it was in before the tornado struck, thus allowing Tenant to terminate the Lease early under Paragraph 17. Finally, the trial court concluded that Paragraph 16 of the Lease authorized the awarding of attorney's fees to Defendants, and it included an award of $15,000 of such fees in the judgment.

Landlord now timely appeals, raising three points of alleged error. Finding merit in two of them, we reverse the judgment and remand the case for further proceedings consistent with this opinion.

**Standard of Review**

We will affirm a judgment following a bench trial unless it is not supported by substantial evidence, is against the weight of the evidence, or erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). We leave all credibility determinations to the trial court, "which is free to believe none, part or all of the testimony of any witness." *Williams Constr., Inc. v. Wehr Constr., L.L.C.*, 403 S.W.3d 660, 662 (Mo. App. S.D. 2012). The interpretation of a lease agreement, however, is a question of law we

2

review *de novo*, and we owe no deference to the trial court's interpretation. ***Collins & Hermann, Inc. v. TM2 Constr. Co.***, 263 S.W.3d 793, 796 (Mo. App. E.D. 2008).

## The Lease

We quote Paragraph 1 of the Lease *in toto*, then recite the relevant portions of Paragraphs 16 and 17.

1. **PREMISES**. Landlord is the owner of and hereby leases the Premises (defined below) to Tenant, and Tenant hereby leases from Landlord, in accordance with the terms, provisions and conditions of this Lease, the exclusive use by Tenant of the restaurant space on the first floor and club space in the basement (formerly Dick Clark's AB Grill and Club '57, respectively) (the "Premises") located in that certain building located at 1600 W. Highway 76, Branson, Missouri, legally described in attached Exhibit A, and visually depicted in attached Exhibit B.

16. **INDEMNIFICATION**. Except with respect to Tenant's . . . breach of its representations and warranties hereunder . . . Landlord shall defend all actions against Tenants with respect to, and shall pay, protect, indemnify and save harmless the Tenant from and against, any and all liabilities, lawsuits, damages, costs, expenses (including reasonable attorneys' fees and expenses), causes of action, claims, demands, or judgments of any nature (i) to which the Tenant is subject to because of the Tenant's interest in the Premises, or (ii) arising from . . . Landlord [sic] violation or breach of this Lease[.[2]]

17. **FIRE OR OTHER CASUALTY**. In the event the Premises is totally destroyed or partially damaged by fire or other casualty making it inoperable for a period of longer than ninety (90) days, either party may, at its option, terminate this Agreement . . . . In the event the parties do not so terminate this Lease, then, subject to the following provisions of this Paragraph 17, Landlord may proceed as soon as is reasonably practicable, at its sole cost and expense to the extent of insurance proceeds available, if any, to repair and restore the Premises to substantially the same condition as that before the damage occurred . . . . In the event Landlord does not complete such

---

[2] Paragraph 16 further contains a mirror provision under which "Tenant shall defend all actions against Landlord . . . and shall pay, protect, indemnify and save harmless the Landlord[.]"

3

repair and restoration within six (6) months from the date of damage or destruction, Tenant may terminate this Agreement.

**Facts**

On February 29, 2012, a tornado struck the Branson area and severely damaged the building that housed the Midtown Café and Club '57. Interior damage included shattered windows, water damage to the carpeting, and "blown out" ceiling tiles. Repairs to the interior of the building were, according to Goode, "mostly" complete fifty-one days after the tornado; however, Goode noted that the Midtown Café "still had roof leaks" at that time.

In regard to the exterior of the building, the tornado had caused damage to the roof, refrigeration units, exterior wall, and "art deco" façade. As part of the ensuing repairs, Landlord's management decided to "blend" the exterior of the building with the adjacent Dick Clark Theater. Although Goode "was not okay" with this plan because of the resulting aesthetic changes, he "didn't feel like [he] had any say in it." The Midtown Café reopened April 20, 2012, during which time construction continued on the exterior of the building.

During this construction, the Midtown Café was without exterior neon lighting for a period exceeding six months from the date of the tornado. Such lighting had adorned the exterior prior to the tornado, and Goode testified that he had relied on this "flashy" lighting scheme to attract tourists and customers to the Midtown Café after sunset.

On August 25, 2012, Goode detected a leak in the kitchen of the Midtown Café—an area where no leaks had occurred previously. As a result of the leak, the Midtown Café was closed for business; however, a roofing company soon commenced repairs, which, as Landlord advised Goode, were projected to be complete by August 29, 2012. The parties dispute whether this leak was related to the tornado and whether the problem was timely repaired.

4

On August, 29, 2012 (exactly six months from the date of the February tornado), Goode submitted a letter on behalf of Tenant to Landlord indicating that Tenant was electing to terminate the Lease pursuant to Paragraph 17. In that letter, Goode argued that Landlord had failed to address certain damage caused by the tornado within Paragraph 17's stated six-month timeframe.

As noted above, the trial court concluded that the conditions necessary to allow Tenant to terminate the Lease pursuant to Paragraph 17 had been satisfied. As support for its conclusion, the trial court found that: (1) Landlord "failed to restore the [P]remises to its original appearance and design, which had the effect of significantly altering the appearance of the building from its original design at the time of the [Lease]"; (2) Landlord "failed to install any exterior neon or LED lighting to the Premises within six (6) months of the date of the tornado damage to the Premises"; and (3) Landlord "failed to restore, repair and/or properly install the roofing and portions of the exterior wall of the Premises prior to August 29, 2012, which forced Defendants to close the Premises due to excessive leaking from the roof."

**Analysis**

*Point I – The "Premises" as Defined by the Lease*

Landlord's first point contends the trial court erred in its interpretation of Paragraph 1 of the Lease. Specifically, Landlord argues that the "Premises"—the property Tenant leased from Landlord—is restricted to the interior portions of the building described in the Lease and does not include the exterior portions. We agree.

If a commercial lease agreement, like any other contract, is unambiguous, we determine the intent of the parties by giving the words they used in their agreement "their

5

plain, ordinary, and usual meaning. Only when the language is ambiguous and not clear will we resort to extrinsic evidence to resolve a contractual ambiguity." *AB Realty One, LLC v. Miken Techs., Inc.*, No. ED 101457, 2015 WL 4716131, at *5 (Mo. Ct. App. July 31, 2015) (internal citations omitted).[3] The dictionary is a good source for finding the ordinary meaning of contract language. *Shahan v. Shahan*, 988 S.W.2d 529, 535 (Mo. banc 1999). "[A] contract must be construed as a whole. It must be viewed from end to end and corner to corner[.]" *Parker v. Pulitzer Publ'g Co.*, 882 S.W.2d 245, 249 (Mo. App. E.D. 1994) (citation and quotation omitted).

> According to Paragraph 1 of the Lease, Tenant leased, for its exclusive use,
>
> the restaurant space on the first floor and club space in the basement (formerly Dick Clark's AB Grill and Club '57, respectively) (the "Premises") located in that certain building located at 1600 W. Highway 76, Branson, Missouri, legally described in attached Exhibit A, and visually depicted in attached Exhibit B.

Exhibit A is a legal description for land that makes no reference to the dimensions of any building. Exhibit B is a copy of an overhead architectural schematic, a portion of which -- roughly one-fifth of the total building area -- has been crudely marked with a hand-drawn boundary line. The unmarked part of Exhibit B includes the large theater portion of the building. The trial court, referring to this exhibit, concluded, "The visual depiction of the Premises attached as Exhibit B used to supplement the definition of the 'Premises' denotes that the exterior walls of the building are included in the definition of the 'Premises.'"

Landlord argues, and we agree, that the trial court's reliance on Exhibit B is misplaced. The plain wording of Paragraph 1 indicates that Exhibit B visually depicts the building inside which the Premises is located.

---

[3] Although they reach different conclusions about its meaning, both parties assert that the Lease is unambiguous.

This interpretation is supported by the placement of the phrase "(the 'Premises')" within Paragraph 1. Its location—after the provision, "the restaurant space on the first floor and club space in the basement[,]" but before the provision, "located in that certain building located at 1600 W. Highway 76, Branson, Missouri, legally described in attached Exhibit A, and visually depicted in attached Exhibit B"—denotes that "(the 'Premises')" was meant to incorporate the former provision, not the latter. Thus, the Premises, so defined and read in light of the remaining provision, is "located *in* that certain building located at 1600 W. Highway 76, Branson, Missouri, legally described in attached Exhibit A, and visually depicted in attached Exhibit B." (Emphasis added.) This context unambiguously indicates that the Premises was not the building itself.

This distinction is supported by and consistent with other portions of the Lease. For instance, Paragraph 12, which outlines the obligations of Landlord and Tenant to undertake maintenance and repairs, states, "Landlord shall repair as necessary, pay for at its sole expense and maintain the roof, exterior walls and anything connected to the exterior walls . . . of the building that *encompasses* the Premises[.] (Emphasis added.)

Additionally, Paragraph 13, which addresses allowable alterations to the Premises, states that Tenant may make alterations to "the interior of the Premises" but "shall not be entitled to make any alterations to the exterior of the building that *encompasses* the Premises[.]" (Emphasis added.) Paragraph 25 addresses ingress and egress rights to other parts of the building. It states that the parties "understand and agree that Landlord or third parties will operate areas of the property that *encompass* the Premises (the theatre and the museum), and that it will benefit all operations in the building for there to be unimpeded pedestrian/customer access to all portions of the building." (Emphasis added.)

Webster's Third New International Dictionary defines "encompass" as "to form a circle about" and "to make a circuit around[.]" WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 747 (1976). Thus, under the plain language of the Lease, the building (of which the "exterior walls" or "exterior" are said to be a part) are not *within* the Premises but instead *encircle* the Premises. As a result, the trial court erred in concluding that the definition of the "Premises" included the exterior walls of the building. Point I is granted.

*Point II – Whether Repairs were Substantially Complete under Paragraph 17*

In its second point, Landlord contends the trial court erroneously applied the law when it concluded that repairs to the Premises were not "substantially complete" per the terms of Paragraph 17. Landlord relies on ***Sw. Eng'g Co. v. Reorganized School Dist. R-9***, 434 S.W.2d 743, 751 (Mo. App. Spfld.D. 1968), which states that a building is "substantially complete" when "construction has progressed to the point that *the building can be put to the use for which it was intended*, even though comparatively minor items remain to be furnished or performed in order to conform to the plans and specifications of the completed building." (Emphasis added.) Landlord argues that because the Midtown Café reopened in April 2012, it was put to the use for which it was intended and, therefore, was "substantially complete" as a matter of law. We question whether this principle of law related to the construction of an entire structure is applicable to Paragraph 17 of the Lease.

As relevant in this case, Paragraph 17 provides that in the event of fire or other casualty, Landlord must "repair and restore the Premises to substantially the same condition" within six months from the date of damage or destruction. If this condition is not met, Tenant may terminate the Lease. We decline Landlord's invitation to find that repairs to the

8

Premises were substantially complete as a matter of law under *Sw. Eng'g Co*. Even if we assume that the case is applicable to a lease of interior spaces within a building (a question we do not decide), that case stands for the proposition that the question of whether a building is substantially complete is "one of fact for the trial court[.]" *Id*. *Cf. Quality Wig Co., v. J.C. Nichols Co.,* 728 S.W.2d 611, 619 (Mo. App. W.D. 1987) (lessor's claim on appeal that it was in substantial compliance with a lease obligation was without merit because "[t]he jury decided the issue in favor of the [lessee]").

Here, the trial court found that "[t]he remaining repairs to the Premises as of August 29, 2012, were not 'minor items' as suggested by [Landlord]." As noted in our resolution of Point I, the trial court utilized an erroneous definition of the Premises when it applied the facts to Paragraph 17 of the Lease. As a result, it relied on facts related to the outside of the building in reaching its conclusion that the Premises had not been "repair[ed] and restore[d] . . . to substantially the same condition" within six months. That being said, we cannot say, based on the record before us, that the trial court relied *solely* on the status of exterior repairs in reaching its decision. Arguably, the ongoing water leakage was an issue germane to the interior of the building and, thus, the Premises.[4] Whether Landlord failed to repair and restore the Premises per the requirements of Paragraph 17 is a factual question that the trial court must decide after applying the correct definition of Premises. Point II is denied.

---

[4] In the argument portion of its brief, Landlord argues that there is no evidence linking any water leak occurring after the Midtown Café reopened for business with the February 29, 2012 tornado. We do not consider this sufficiency of the evidence challenge because it goes beyond the scope of the legal challenge asserted in Landlord's point relied on. "Errors raised for the first time in the argument portion of the brief and that are not raised in the point relied on need not be considered by [this court]." *Morgan Publ'ns, Inc. v. Squire Publishers., Inc.*, 26 S.W.3d 164, 177 n.8 (Mo. App. W.D. 2000) (quotation omitted).

*Point III – Attorney's Fees Award*

Point III contends the trial court erred in awarding attorney's fees to Defendants pursuant to Paragraph 16 of the Lease—an issue rendered moot for purposes of this appeal by virtue of our disposition of Point I. Nevertheless, we elect to address Landlord's third point because it raises a question of law that is likely to arise again on remand.

"Generally, Missouri does not allow recovery of attorney fees and other litigation expenses in damage actions." ***Killion v. Bank Midwest, N.A.***, 987 S.W.2d 801, 809 (Mo. App. W.D. 1998). However, "[a]ttorney fees may be recovered when provided for by statute or contract, when incurred because of involvement in collateral litigation, or when needed to balance benefits in a court of equity." ***Id.*** (internal quotation omitted).

At issue here is Paragraph 16 of the Lease, entitled "**INDEMNIFICATION**." Indemnification has been defined as,

> the shifting of responsibility from the shoulders of one person to another. Indemnity is a right that inures to the person who has discharged a duty that is owed by him, but which, as between himself and another, should have been discharged by the other, so that if the other does not reimburse the person, the other is unjustly enriched to extent that his liability has been discharged.

***SSM Health Care St. Louis v. Radiologic Imaging Consultants, LLP***, 128 S.W.3d 534, 539 (Mo. App. E.D. 2003) (internal citations omitted). "As a general rule, indemnification is allowed in favor of one who is held responsible solely by imputation of law because of his relation to the actual wrongdoer." ***Id.***

The language of Paragraph 16 is consistent with the above definition. By means of mirror provisions, it provides that either party "shall defend all actions" against the other party. It goes on to state that the parties "shall pay, protect, indemnify and save harmless" each other from liabilities to which one party is subject to because of its interest in the

10

Premises or the other party's violation of the Lease. Thus, Paragraph 16 provides an avenue where Landlord and Tenant may shift the responsibility for a liability from one to the other, *i.e.*, where Tenant is exposed to liability to a third party as a result of Tenant's interest in the Premises or the acts or omissions of Landlord. Because no such situation exists in this case, Paragraph 16 is inapplicable. Point III is granted.[5]

The judgment is reversed, and the cause is remanded for proceedings not inconsistent with this opinion.

DON E. BURRELL, P.J. - OPINION AUTHOR

NANCY STEFFEN RAHMEYER, J. - CONCURS

WILLIAM W. FRANCIS, JR., J. - CONCURS

---

[5] The motion filed by Defendants for an award of attorney fees in connection with this appeal is denied.